1   COOLEY LLP
    ANTHONY M. STIEGLER (126414)
2   (tstiegler@cooley.com)
    DARCIE A. TILLY (239715)
3   (dtilly@cooley.com)
    4401 Eastgate Mall
4   San Diego, CA  92121
    Telephone:      (858) 550-6000
5   Facsimile:      (858) 550-6420

6   MICHELLE S. RHYU (212922)
    (rhyums@cooley.com)
7   3175 Hanover Street
    Palo Alto, CA 94304-1130
8   Telephone:      (650) 843-5000
    Facsimile:      (650) 849-7400

9
    BONNIE W. MCLEOD (*pro hac vice application pending*)
10  (bweissmcleod@cooley.com)
    MARK L. HAYMAN (*pro hac vice application pending*)
11  (mhayman@cooley.com)
    777 6th Street, NW, Suite 1100
12  Washington, DC 20001
    Telephone:      (202) 842-7800
13  Facsimile:      (202) 842-7899

14  Attorneys for PLAINTIFF
    THE SALK INSTITUTE FOR BIOLOGICAL STUDIES
15

16              UNITED STATES DISTRICT COURT

17              SOUTHERN DISTRICT OF CALIFORNIA

18

19  THE SALK INSTITUTE FOR             Case No.      **'10 CV 2649 DMS CAB**
    BIOLOGICAL STUDIES,
20                                     **COMPLAINT FOR**
                Plaintiff,
21                                     **(1) Declaratory Relief;**
         v.                            **(2) Inducing Breach of Contract;**
22                                     **(3) Intentional Interference with**
    FERRING PHARMACEUTICALS, INC.;         **Economic Advantage;**
23  FERRING RESEARCH INSTITUTE, INC.;  **(4) Unjust Enrichment;**
    FERRING INTERNATIONAL CENTER       **(5) Unfair Competition; and**
24  S.A.; FERRING B.V.; FERRING A.B.;  **(6) Patent Infringement**
    FREDERICK PAULSEN, JR.; and DOES 1
25  through 10,                        **DEMAND FOR A JURY TRIAL**

26              Defendants.

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
                                       **CASE NO.**
                                       **COMPLAINT AND JURY DEMAND**

Plaintiff The Salk Institute for Biological Studies, by and through its counsel, alleges as follows:

## INTRODUCTION

1.      This case is about the diversion and theft by Ferring Pharmaceuticals, Inc. and it's related entities from The Salk Institute for Biological Studies of drug discoveries that resulted in the prostate cancer drug FIRMAGON (degarelix).

2.      The Salk Institute was founded in 1960 by Jonas Salk, M.D., following his discovery and development of the polio vaccine.  The Salk Institute's major areas of study include molecular biology, genetics, neurosciences, and plant biology.  Knowledge acquired in Salk's laboratories provides new understanding and potential therapies and treatments for a wide range of diseases and disorders, including cancer, AIDS, Alzheimer's disease, cardiovascular disease, and birth defects.  Knowledge gained at Salk has also been used to help improve the world's food supply.  The Salk Institute is recognized across the world as one of the most renowned biological research institutions, contributing hundreds of fundamental discoveries to mankind every year.  It consistently ranks among the leading research institutions in the world by the objective metrics used within the field to assess faculty contributions and the practical impact of their findings.  The Salk Institute conducts its research under the guidance of sixty-one faculty investigators and employs a scientific staff of more than 850, including visiting scientists, post-doctoral fellows, and graduate students.  The Salk Institute has trained more than 2000 scientists, many of whom have gone on to positions of leadership in prominent research centers worldwide. Five scientists trained at The Salk Institute have won Nobel Prizes and four current resident faculty members are Nobel Laureates.  The Salk Institute's faculty includes 16 members of the National Academy of Sciences, one of the most highly respected scientific organizations in the world.  Originally funded by a grant from the March of Dimes, Salk is currently funded by charitable gifts, bequests, and government research funding.  An additional crucial means of funding its important research is fees obtained by licensing others to make, use, and sell inventions discovered by Salk scientists.  Ferring, however, pursued a deliberate plan to exploit Salk's research relating to gonadotropin-releasing hormone antagonists without obtaining any

1   rights to use such research and discoveries or providing compensation to Salk, and by filing

2   patent applications in its own name claiming ownership of discoveries that rightfully belong to

3   Salk.   This lawsuit seeks ownership of the those patent rights and financial redress for the

4   Ferring's misconduct and theft.

5                                              **THE PARTIES**

6          **3.**        Plaintiff The Salk Institute for Biological Studies ("Salk" or "The Salk Institute")

7   is a world renowned non-profit research institute organized under the laws of the State of

8   California and maintaining its  principal place of business at 10010 North Torrey Pines Road, La

9   Jolla, CA 92037.

10         **4.**        Defendant Ferring Pharmaceuticals, Inc. is an entity organized under the laws of

11  the State of Delaware and maintaining a principal place of business at 4 Gatehall Drive, Third

12  Floor, Parsippany, NJ 07054.

13         **5.**        Defendant Ferring Research Institute, Inc. is an entity organized under the laws of

14  the State of California and maintaining a principal place of business at 4245 Sorrento Valley

15  Blvd., San Diego, CA 92121.

16         **6.**        The Salk Institute is informed and believes, and therefore alleges, that defendant

17  Ferring International Center S.A. is an entity organized under the laws of Switzerland and

18  maintaining a principal place of business at Ch. de la Vergognausaz 50, 1162 Saint-Prex,

19  Switzerland.

20         **7.**        The Salk Institute is informed and believes, and therefore alleges, that defendant

21  Ferring B.V. is an entity organized under the laws of the Netherlands and maintaining a principal

22  place of business at Polarisavenue 144, 2132 JX Hoofddorp, The Netherlands.

23         **8.**        The Salk Institute is informed and believes, and therefore alleges, that defendant

24  Ferring A.B. is an entity organized under the laws of Sweden and maintaining a principal place of

25  business at Södergatan 26, 4tr, 211 34 Malmö, Sweden.

26         **9.**        The Salk Institute is informed and believes, and therefore alleges, that defendant

27  Frederick Paulsen, Jr. is a citizen of Switzerland and resides in Lausanne, Switzerland.

28

10. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants named as DOES 1 through 10 inclusive, are unknown to The Salk Institute, and Salk therefore sues these defendants by fictitious names. The Salk Institute will seek leave to amend this complaint to include the true names and capacities of the DOE defendants when ascertained.

11. Unless otherwise specified, Ferring Pharmaceuticals, Inc., Ferring Research Institute, Inc., Ferring International Center S.A., Ferring B.V., Ferring A.B., and DOES 1 through 10 will be referred to collectively as "Ferring." Ferring and Mr. Paulsen will be collectively referred to as "Defendants."

**JURISDICTION AND VENUE**

12. This is a civil action for claims arising under California law and for patent infringement arising under the United States patent statutes, 35 U.S.C. §§ 1-376.

13. The United States District Court for the Southern District of California has federal question jurisdiction over the subject matter of the patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

14. The United States District Court for the Southern District of California has supplemental jurisdiction over the subject matter of the state law claims under 28 U.S.C. § 1367.

15. The Salk Institute is informed and believes, and therefore alleges, that Ferring Pharmaceuticals, Inc. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because Ferring Pharmaceuticals, Inc. committed acts within California and this judicial district which give rise to this action, and has established minimum contacts with the forum, such that the exercise of jurisdiction over Ferring Pharmaceuticals, Inc. would not offend traditional notions of fair play and substantial justice.

16. The Salk Institute is informed and believes, and therefore alleges, that Ferring Research Institute, Inc. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because of Ferring Research Institute, Inc.'s presence in California, its systematic, continuous contacts with California, and because it committed acts within California and this judicial district which give rise to this action.

17.     The Salk Institute is informed and believes, and therefore alleges, that Ferring International Center S.A. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because Ferring International Center S.A. committed acts within California and this judicial district which give rise to this action, and has established minimum contacts with the forum, including contacts through its subsidiaries, agents, and alter egos, such that the exercise of jurisdiction over Ferring International Center S.A. would not offend traditional notions of fair play and substantial justice.

18.     The Salk Institute is informed and believes, and therefore alleges, that Ferring B.V. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because Ferring B.V. committed acts within California and this judicial district which give rise to this action, and has established minimum contacts with the forum, such that the exercise of jurisdiction over Ferring B.V. would not offend traditional notions of fair play and substantial justice.

19.     The Salk Institute is informed and believes, and therefore alleges, that Ferring A.B. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because Ferring A.B. committed acts within California and this judicial district which give rise to this action, and has established minimum contacts with the forum, such that the exercise of jurisdiction over Ferring A.B. would not offend traditional notions of fair play and substantial justice.

20.     The Salk Institute is informed and believes, and therefore alleges, that Frederik Paulsen, Jr. is subject to the personal jurisdiction of the United States District Court for the Southern District of California because he committed acts within California and this judicial district which give rise to this action, and he established minimum contacts with the forum such that the exercise of jurisdiction over Mr. Paulsen would not offend traditional notions of fair play and substantial justice.

21.     Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).

## VICARIOUS LIABILITY, ALTER EGO,

## CONSPIRACY, AND AIDING AND ABETTING

22.     The Salk Institute is informed and believes, and therefore alleges, that Ferring Pharmaceuticals, Inc. is owned, operated, and/or controlled by its parent Ferring International Center S.A. and worked as an agent of and in collaboration with Ferring International Center S.A. The Salk Institute is further informed and believes, and therefore further alleges, that Ferring Pharmaceuticals, Inc. is the United States agent for Ferring International Center S.A. for purposes including, but not limited to, making regulatory submissions to the Unites States Food and Drug Administration ("FDA"), and manufacturing and marketing the drug degarelix (trade name: FIRMAGON) in the United States.

23.     The Salk Institute is informed and believes, and therefore alleges, that Ferring Research Institute, Inc. is owned, operated, and/or controlled by its parent Ferring International Center S.A. and worked as an agent of and in collaboration with Ferring International Center S.A. The Salk Institute is further informed and believes, and therefore further alleges, that Ferring Research Institute, Inc. is the United States agent for Ferring International Center S.A. for purposes including, but not limited to, research and development.

24.     The Salk Institute is informed and believes, and therefore alleges, that Ferring B.V. is owned, operated, and/or controlled by its parent Ferring International Center S.A. and worked as an agent of and in collaboration with Ferring International Center S.A.  The Salk Institute is further informed and believes, and therefore further alleges, that Ferring B.V. is the United States agent for Ferring International Center S.A. for purposes including, but not limited to, making submissions to the Unites States Patent and Trademark Office ("USPTO") for the purpose of obtaining protection for potential inventions under the United States patent statutes, 35 U.S.C. §§ 1-376 and ownership of the website www.firmagon.us.

25.     The Salk Institute is informed and believes, and therefore alleges, that Ferring A.B. is owned, operated, and/or controlled by its parent Ferring International Center S.A. and worked as an agent of and in collaboration with Ferring International Center S.A.  The Salk Institute is further informed and believes, and therefore further alleges, that Ferring A.B. was the

1    United States agent for Ferring International Center S.A. for purposes including, but not limited

2    to, entering contractual agreements with persons associated with Ferring Research Institute, Inc.

3        **26.**    The Salk Institute is informed and believes, and therefore alleges, that Ferring

4    International Center S.A., Ferring Pharmaceuticals, Inc., Ferring Research Institute, Inc., Ferring

5    B.V., and Ferring A.B., maintain a relationship with themselves that is sufficiently close to justify

6    piercing the corporate veil and holding one corporation legally accountable for the actions of the

7    others.  The Salk Institute is informed and believes, based on public statements disseminated by

8    Ferring International Center S.A. and entities that generically refer to themselves as "Ferring" or

9    "Ferring Pharmaceuticals," that there is a unity of interest and ownership between all the

10   corporations such that their separate personalities no longer exist, and that Ferring

11   Pharmaceuticals, Inc., Ferring Research Institute, Inc., Ferring B.V., and Ferring A.B., among

12   other entities, are the alter ego (i.e., a mere shell, instrumentality, agent, conduit, or adjunct) of

13   Ferring International Center S.A.  For example,

14        **a.**    Ferring International Center S.A. states on the "Legal Disclaimer" page of

15                  its website (located at http://www.ferring.com/en/global/legal-

16                  disclaimer.htm):  "This site contains material about Ferring International

17                  Center S.A. and its Affiliates, (hereinafter the ["]Ferring Group"). . . .

18                  Affiliates shall mean any legal entity controlling, controlled by or under

19                  common control by or under common control with Ferring International

20                  Center S.A."

21        **b.**    Ferring International Center S.A. states on the "Research and Development

22                  – r&d Centres" page of its website (located at http://www.ferring.com/-

23                  en/randd/RandD+Centres/):   "The Ferring Research Institute (FRI) is

24                  founded in San Diego, USA to undertake drug discovery focusing

25                  on peptide therapeutics.  Ferring's peptide research is transferred from

26                  Sweden to the USA."

27        **c.**    Ferring International Center S.A. states on the "about us – executive board"

28                  page of its website (located at http://www.ferring.com/en/aboutus/-

executive-board/Pascal_Danglas.htm/) that Pascal Danglas is the Executive Vice President, Clinical and Product Development and "has responsibility for all activities associated with the development of Ferring medicines and their registration globally."  On December 24, 2009, Dr. Danglas stated in a press release:  "Degarelix was discovered in San Diego, developed by Ferring Pharmaceuticals in the U.S. and Europe. . . .  We are delighted to deliver a new treatment option for advanced prostate cancer to the medical community."

27.     With respect to the wrongful acts alleged in this Complaint, Ferring and Mr. Paulsen (in his individual capacity) have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  Defendants knowingly agreed to participate, directly or indirectly, in the common plan or design alleged in this Complaint to wrongfully deprive The Salk Institute of its rights to research and inventions of Salk's scientist, Jean Rivier, Ph.D.  The numerous acts alleged in this Complaint were done pursuant to such knowing agreement to wrongfully deprive The Salk Institute of its rights to research and inventions of Dr. Rivier.  As a result of the numerous acts alleged in this Complaint, The Salk Institute was harmed by being deprived of its rights to the research and inventions of Dr. Rivier.

28.     In addition to the wrongful conduct alleged in the Complaint as giving rise to primary liability, Ferring and Mr. Paulsen (in his individual capacity) aided and abetted and/or assisted each other in conduct alleged below.

### BACKGROUND FACTS

29.     As noted above, The Salk Institute is a world renowned research institute, which has produced thousands of discoveries and inventions covering the basic science of life.

30.     The Salk Institute requires considerable funding to support its scientists and their basic research programs.  A critical and integral component of Salk's mission is the transfer of its technology and inventions to the private sector so that it can be further developed and applied for therapeutic uses across the world.  Technology transfer is accomplished through Salk's licensing

1    of its intellectual property, technical know-how and biological materials to companies and other

2    research institutions, such as Ferring.  In part, Salk depends on earning a fair economic return

3    from the fundamental scientific and medical discoveries and inventions made by its scientists as a

4    source of its critical funding.

5         **31.**     On or around June 17, 1970, Jean Rivier, Ph.D. began his employment at The Salk

6    Institute.  Dr. Rivier is currently the Frederik Paulsen Chair in Neurosciences at The Salk Institute

7    and professor in The Clayton Foundation Laboratories for Peptide Biology.  Dr. Rivier specializes

8    in the study of hormones produced by the brain.  He received his education in Chemical

9    Engineering and his Ph.D. in Organic Chemistry at Ecole Polytechnique of the University of

10   Lausanne, Switzerland, and did his Postdoctoral fellowship at Rice University in Texas.  He has

11   served as the President of the American Peptide Society, the Chairman of the American Peptide

12   Symposium, and has been honored with the Gordon Peptide Conference Vicent du Vigneaud

13   Award and the Sidney H. Ingbar Distinguished Service Award from the Endocrine Society.

14        **32.**     Upon the commencement of his employment, Dr. Rivier executed a "Patent

15   Agreement" with The Salk Institute.  The Patent Agreement states in relevant part:

16             **a.**     "I [Dr. Rivier] understand and agree that every possible patentable device,

17                     process, or product hereinafter referred to as invention, which I conceive or

18                     develop while employed by the Institute, or during the course of utilization

19                     of any Institute research facilities, shall be examined by the Institute to

20                     determine rights and equities therein in accordance with the Institute's

21                     patent policy. . . ."

22             **b.**     "I [Dr. Rivier] further agree that, in the event any such invention shall be

23                     deemed by the Institute to be patentable, and the Institute desires, pursuant

24                     to determination by the Institute as to its rights and equities therein, to seek

25                     patent protection thereon, I shall execute any documents and do all things

26                     necessary, at the Institute's expense, to assign to the Institute all rights, title

27                     and interest therein and to assist the Institute in securing patent protection

28                     thereon."

**c.** "In the event that the Institute does not see fit to apply for patent and prosecute same, I [Dr. Rivier] shall have the right to do so; but I must, nevertheless, assign the patent to the Institute and the fees will be handled exactly as if it were a patent paid for and patented by the Institute except that the expenses incurred by me in the patenting the invention and other appropriate expenses incidental thereto shall be refunded to me out of the first royalties collected."

33.    During his entire forty year career at The Salk Institute, Dr. Rivier's research has focused on the chemistry of peptide hormones produced by the brain and their pharmacology, including gonadotropin-releasing hormone ("GnRH").  Dr. Rivier began his work at Salk in the laboratory of Nobel Laureate Roger Guillemin.  Dr. Rivier's historic work included research regarding GnRH agonists (a chemical that binds to a receptor of a cell and triggers a response by that cell) and GnRH antagonists (a chemical that binds to a receptor of a cell and blocks or dampens agonist-mediated responses).  Dr. Rivier's work at Salk included extensive investigation into GnRH antagonists useful for the treatment of sex steroid dependent cancers (such as prostate cancer) and endometriosis.  Over the course of his research career at The Salk Institute, Dr. Rivier obtained public and private grant funding to conduct his laboratory's research and to publish numerous articles regarding GnRH agonists and antagonists.

34.    As a result of Dr. Rivier's extensive research at The Salk Institute, Salk published numerous papers and applied for and obtained patent rights to various GnRH antagonist compounds.

35.    For instance, Dr. Rivier's early work with GnRH antagonists at Salk is evidenced by the following publications:

**a.**    Perrin MH, Rivier JE, and Vale WW, Radioligand assay for gonadotropin-releasing hormone: relative potencies of agonists and antagonists, *Endocrinology* 106(4):1289-96 (1980).

**b.**    Perrin MH, Haas Y, Rivier JE, and Vale WW, Gonadotropin-releasing hormone binding to rat anterior pituitary membrane homogenates.

1   Comparison of antagonists and agonists using radiolabeled antagonist and

2   agonist, *Mol. Pharmacol.* 23(1):44-51 (1983).

3   c.   Karten MJ and Rivier JE, Gonadotropin-releasing hormone analog design.

4   Structure-function studies toward the development of agonists and

5   antagonists: rationale and perspective. *Endocr. Rev.* 7(1):44-66 (1986).

6   d.   Urban RJ, Pavlou SN, Rivier JE, Vale WW, Dufau ML, and Veldhuis JD,

7   Increased potency and sustained suppressive actions of a new

8   gonadotropin-releasing hormone (GnRH) antagonist peptide in man, *Trans.*

9   *Assoc. Am. Physicians* 101:302-9 (1988).

10   **36.**   Among Dr. Rivier's patents assigned to The Salk Institute addressing GnRH

11   antagonists are United States Patent Nos. 5,169,932 (the '932 Patent), 5,296,468 ("the '468

12   Patent"), 5,580,957 ("the '957 Patent"), U.S. Patent 5,506,207 ("the '207 Patent"), and 6,747,125

13   ("the '125 Patent").

14   a.   On December 8, 1992, the United States Patent and Trademark Office duly

15   and legally issued the '932 Patent entitled "GnRH analogs," which claims

16   the benefit of U.S. Application No. 07/428,827 filed October 30, 1989.

17   The '932 Patent is assigned to The Salk Institute and lists as inventors Carl

18   A. Hoeger, Jean E.F. Rivier, Paula G. Theobald, John S. Porter, Catherine

19   L. Rivier, and Wylie W. Vale Jr.

20   b.   On March 22, 1994, the United States Patent and Trademark Office duly

21   and legally issued the '468 Patent entitled "GnRH Analogs."  The '468

22   Patent is assigned to The Salk Institute and lists as inventors Carl A.

23   Hoeger, Jean E.F. Rivier, Paula G. Theobald, John S. Porter, Catherine L.

24   Rivier, and Wylie W. Vale Jr.

25   c.   On December 3, 1996, the United States Patent and Trademark Office duly

26   and legally issued the '957 Patent entitled "GnRH Analogs."  The '957

27   Patent is assigned to The Salk Institute and lists as inventors Carl A.

28   Hoeger, Jean E.F. Rivier, Paula G. Theobald, and John S. Porter.

      **d.**      On April 9, 1996, the United States Patent and Trademark Office duly and legally issued the '207 Patent entitled "GnRH Antagonists XIII." The '207 Patent is assigned to The Salk Institute and lists as inventors Jean E.F. Rivier, John S. Porter, Carl A. Hoeger, Guangcheng Jiang, and Catherine L. Rivier.

      **e.**      On June 8, 2004, the United States Patent and Trademark Office duly and legally issued the '125 Patent entitled "Peptide intermediates for making GnRH antagonists." The '957 Patent is assigned to The Salk Institute and lists as inventors Carl A. Hoeger, Jean E.F. Rivier, Paula G. Theobald, and John S. Porter.

37.      On or around September 9, 1991, Guangcheng Jiang began his graduate studies at The Salk Institute in Dr. Rivier's laboratory. Mr. Jiang was a foreign student from his university in the People's Republic of China and was permitted entry into the United States for purposes of his education at The Salk Institute.

38.      Upon beginning his graduate studies at The Salk Institute, Mr. Jiang executed a "Patent Agreement" with the Institute. In the Patent Agreement, Mr. Jiang agreed to execute any documents and do all things necessary to assign to The Salk Institute all rights, title, and interest in any invention conceived or developed while he was employed by The Salk Institute, or during the course of utilization of any Salk Institute research facilities, and to assist The Salk Institute in securing patent protection for such inventions.

39.      While at The Salk Institute, Mr. Jiang was trained by Dr. Rivier and assisted with Dr. Rivier's research into GnRH agonists and antagonists. As part of his research, Mr. Jiang published articles regarding GnRH agonists and antagonists. On information and belief, Mr. Jiang had no prior GnRH peptide agonist or antagonist experience before arriving at Salk.

40.      The Salk Institute is informed and believes, and therefore alleges, that Mr. Paulsen is the Chairman and Chief Executive Officer of Ferring and that Mr. Paulsen is a substantial shareholder in the Dr. Frederik Paulsen Foundation, which is the 100% owner of the Ferring entities.

41.     The Salk Institute is informed and believes, and therefore alleges, that in mid-1995 Mr. Paulsen recruited and offered Dr. Rivier a generous consulting position to establish the Ferring Research Institute ("FRI"), a new research and development center for Ferring in San Diego, California.

42.     The Salk Institute is informed and believes, and therefore alleges, that prior to this time, although Ferring had some experience with GnRH agonists, the state of Ferring's GnRH peptide antagonist program was limited or non-existent.

43.     The Salk Institute is informed and believes, and therefore alleges, that Defendants were aware of Dr. Rivier's association with and work for The Salk Institute in the GnRH antagonist field at the time Mr. Paulsen offered Dr. Rivier a consulting position in 1995. Although unknown by Salk at the time, The Salk Institute recently now has reason to believe and, therefore, alleges, that Ferring's purpose in hiring Dr. Rivier as a consultant was for Dr. Rivier to use the information and know-how he gained from years of research at The Salk Institute to identify peptide GnRH antagonists for Ferring to treat prostate cancer.

44.     The Salk Institute is informed and believes, and therefore alleges, that Dr. Rivier did agree to serve as a scientific advisor consultant for Ferring, in addition to maintaining his position at The Salk Institute.  The Salk Institute is further informed and believes, and therefore further alleges, that Dr. Rivier's consulting term began in October 1995.

45.     The Salk Institute is informed and believes, and therefore alleges, that when Dr. Rivier started consulting for Ferring, Defendants were aware of his obligations to The Salk Institute.  Among other things, when Dr. Rivier sought consent from The Salk Institute to serve as a consultant to Ferring in 1995, Salk made Ferring aware of Dr. Rivier's contractual obligations to Salk.  Further, The Salk Institute is informed and believes, and therefore alleges, that Dr. Rivier signed at least two agreements with Ferring in which Ferring expressly acknowledged that Dr. Rivier was remaining an employee of Salk and that therefore Dr. Rivier continued to be required to comply with his contractual obligations owed to The Salk Institute.  For instance, Dr. Rivier's Non-Disclosure Agreement with Ferring A.B. dated October 1, 1995 states:      "Rivier's Relationship with Salk:   Ferring acknowledges that Rivier is currently employed by and has

1   contractual and other obligations to The Salk Institute for Biological Studies ("Salk").  Ferring

2   also acknowledges that Rivier remains obligated to comply with any contracts he may have with

3   Salk as well as its written regulations and policies applicable to its employees. . . ."

4       **46.**    The Salk Institute is informed and believes, and therefore alleges, that in mid to

5   late 1995, Dr. Rivier directed and managed the establishment of FRI in San Diego, California.

6   Although unknown by Salk at the time, The Salk Institute now has reason to believe and therefore

7   alleges that Ferring established FRI with the objective of implementing Dr. Rivier's hypothesis

8   for discovering a superior GnRH antagonist drug to treat prostate cancer, which was derived from

9   Dr. Rivier's many years of research and inventions at Salk.

10      **47.**    The Salk Institute is informed and believes, and therefore alleges, that Dr. Rivier

11  hired three employees to work at FRI, including Mr. Jiang, who after spending four years in Dr.

12  Rivier's Salk laboratory, was recruited to Ferring before completing his graduate studies.

13      **48.**    Although unknown by Salk at the time, The Salk Institute now has reason to

14  believe and, therefore, alleges, that Dr. Rivier did establish and direct Ferring's research and

15  development into GnRH antagonist peptides.

16      **49.**    In just over one year after FRI was founded, on April 11, 1997, Ferring filed

17  United States Patent Application No. 08/837,042 titled "GnRH Antagonists," claiming the

18  discovery which was FIRMAGON, but only listing Mr. Jiang and Graeme Semple as inventors,

19  and omitting Dr. Rivier.  A little over two years later, after many interactions between Ferring and

20  the U.S. Patent Office, on July 20, 1999, the patent application issued as United States Patent No.

21  5,925,730 ("the '730 Patent"), without Dr. Rivier listed as an inventor.  The '730 Patent identifies

22  Ferring B.V. as the assignee.

23      **50.**    The '730 Patent claims the GnRH antagonist compound degarelix.  The Salk

24  Institute is informed and believes, and therefore alleges, that degarelix was referred to internally

25  at Ferring as FE200486.

26      **51.**    Although unknown by Salk at the time, The Salk Institute now has reason to

27  believe and, therefore, alleges, that in fact, Dr. Rivier was the substantive and lead inventor of the

28  inventions claimed in the '730 Patent.  Dr. Rivier's contribution to the '730 Patent relates directly

to the research Dr. Rivier had been, was currently, and was anticipated to continue performing at The Salk Institute, was based entirely on his experience in the GnRH field as part of his employment with The Salk Institute, and was part of the research Dr. Rivier pursued for Salk that resulted in, among other things, the '468, '957, '125, and 207 Patents assigned to Salk.

52.     On March 13, 1998, Ferring filed United States Patent Application No. 09/402,698 titled "GnRH Antagonists Being Modified at Positions 5 and 6," listing only Mr. Jiang and Dr. Semple as inventors.  On April 10, 2001, the patent issued as United States Patent No. 6,214,798 ("the '798 Patent").  Dr. Rivier was not listed as an inventor on the '798 Patent when it published in 2001.  The '798 Patent identifies Ferring B.V. as the assignee.

53.     Although unknown by Salk at the time, The Salk Institute now has reason to believe and, therefore, alleges, that Dr. Rivier was the substantive and lead inventor of the inventions claimed in the '798 Patent.  Dr. Rivier's contribution to the '798 Patent relates directly to the research Dr. Rivier had been, was currently, and was anticipated to continue performing at The Salk Institute, was based entirely on his experience in the GnRH field as part of his employment with The Salk Institute, and was part of the research Dr. Rivier pursued for Salk that resulted in, among other things, the '468, '957, '125, and 207 Patents assigned to Salk.

54.     Although unknown by Salk at the time, The Salk Institute now has reason to believe  and, therefore, alleges, that in or around 2001, Dr. Rivier approached Defendants to demand inclusion as a named inventor on the '730 Patent and to receive compensation for his contribution to the '730 Patent and FE200486 (degarelix).

55.     Although unknown by Salk at the time, The Salk Institute now has reason to believe and, therefore, alleges, that on or around August 2001, Ferring and Dr. Rivier entered an agreement whereby Ferring agreed to pay Dr. Rivier for services that he had already rendered with respect to the '730 Patent and the conception, inventorship and development of FE200486 (which became degarelix/FIRMAGON), with payments due to Dr. Rivier upon, among other things, issuance of the '730 Patent and upon FDA approval of FE200486, and royalties on the sale of FE200486.

56.    Although unknown by Salk at the time, in September 2004, Dr. Rivier was added by the United States Patent Office as an inventor of the '730 and '798 Patents, based on an application filed by Ferring attesting that Dr. Rivier was, indeed, an inventor of the inventions claimed in the patents and that he had not been omitted as an inventor with deceptive intent.

57.    On Christmas Eve, December 24, 2008, Ferring obtained FDA approval to sell degarelix for the treatment of prostate cancer in the United States.

58.    Two months later, on March 4, 2009, Ferring issued a press release announcing the "immediate availability" in the United States of degarelix for the treatment of advanced prostate cancer.   Ferring currently markets degarelix under the trade name FIRMAGON.   The press release indicates that it was issued by Ferring Pharmaceuticals, Inc.

59.    Dr. Rivier first disclosed to The Salk Institute his involvement at Ferring in the '730 and '798 Patents on or around November 10, 2009, when he informed Salk in a grant funding disclosure notice that he was receiving royalties from Ferring for his work on degarelix. Salk then began investigating the matter and learned for the first time that Dr. Rivier was an inventor of degarelix and listed as an inventor on the '730 and '798 Patents.

60.    The Salk Institute is informed and believes, and therefore alleges, that the reason why Dr. Rivier did not disclose his involvement at Ferring in the '730 and '798 Patents until November 10, 2009 was because he was coached, counseled, instructed, encouraged, and/or directed by Defendants not to disclose or divulge the details of his work at Ferring to Salk, to not disclose his inventorship work at Ferring to The Salk Institute, to not disclose his authorship and participation in the drafting of the patent applications that later matured into the '730 and '798 Patents, and to not disclose to The Salk Institute facts regarding his contribution to the invention of what would become the patented and FDA approved prostate cancer drug degarelix (FIRMAGON).  On information and belief Salk alleges that Dr. Rivier believed, based at least in part on Defendants' representations and communications with him, that disclosure to Salk was unnecessary and that Dr. Rivier followed Defendants' coaching, counseling, instruction, encouragement, and/or direction to not disclose his work at Ferring to Salk, including the subject matter of his GnRH peptide antagonist research at Ferring and the Ferring patent applications

thereon, including but not limited to the details regarding the invention of the degarelix compound, how the invention was made, the identities of the inventor(s), and his role as the lead inventor, the draft patent applications for the '730 and '798 Patents, that he was being compensated by Ferring for various milestones achieved by Ferring with degarelix, or that he was being added as an inventor of the '730 and '798 Patents.

61.     The Salk Institute had no notice or reason to know that Dr. Rivier had been added as an inventor to the '730 and '798 Patents at Ferring's request prior to November 10, 2009, since Defendants did not volunteer or disclose those facts to Salk.  The Salk Institute is informed and believes, and therefore alleges, that instead Defendants chose to remain silent and intentionally conceal, hide, and suppress the above facts from Salk.  Neither Mr. Paulsen, nor anyone else at Ferring, kept The Salk Institute apprised of the subject matter of Dr. Rivier's research at Ferring, on behalf of Ferring, including any research regarding GnRH peptide antagonists.  Neither Mr. Paulsen, nor anyone else at Ferring, shared with The Salk Institute the details regarding the invention of degarelix compound, including how the invention was made, the identities of the inventor(s), or Dr. Rivier's role as the lead inventor.  Neither Mr. Paulsen, nor anyone else at Ferring, provided the draft patent applications for the '730 and '798 Patents to The Salk Institute for Salk's review or consideration.  Neither Mr. Paulsen, nor anyone else at Ferring, informed The Salk Institute that Ferring agreed to compensate Dr. Rivier for various milestones achieved by Ferring with degarelix which are commonly paid to inventors.  Neither Mr. Paulsen, nor anyone else at Ferring, informed The Salk Institute that Dr. Rivier was being added as an inventor of the '730 and '798 Patents.

## COUNT ONE – AGAINST FERRING

### (Declaratory Relief)

62.     The Salk Institutes incorporates by reference the allegations set forth in paragraphs 1 through 61 of this Complaint as though set forth in full in Count One.

63.     An actual controversy has arisen between Ferring and The Salk Institute regarding the ownership of Dr. Rivier's interest in the '730 and '798 Patents.

64. Ferring contends it is the proper assignee of Dr. Rivier's interests in the '730 and '798 Patents whereas The Salk Institute contends that it is the proper assignee of Dr. Rivier's interests in the '730 and '798 Patents.

65. Additionally, The Salk Institute is informed and believes, and therefore alleges, that Mr. Jiang and Dr. Semple did not contribute materially to the conception of the '730 and '798 Patents and were erroneously named as inventors of the '730 and '798 Patents.

66. The Salk Institute is entitled to a declaration under 35 U.S.C. § 256 correcting the inventorship of the '730 and '798 Patents, finding that Dr. Rivier is the sole inventor of the '730 and '798 Patents.

67. The Salk Institute is further entitled to a declaration adjudging that The Salk Institute is the proper assignee of Dr. Rivier's interest in the '730 and '798 Patents.

68. An adjudication of the rights and obligations of the parties is necessary to resolve this dispute. A judicial determination is necessary and appropriate at this time in order that The Salk Institute may determine the extent, nature, and scope of its rights and duties with respect to the foregoing dispute.

## COUNT TWO – AGAINST ALL DEFENDANTS

### (Inducing Breach of Contract)

69. The Salk Institutes incorporates by reference the allegations set forth in paragraphs 1 through 68 of this Complaint as though set forth in full in Count Two.

70. Dr. Rivier entered into a valid and enforceable Patent Agreement with The Salk Institute. As detailed more fully above, at all times relevant, Dr. Rivier has been under a contractual duty to The Salk Institute to disclose to Salk all inventions made by Dr. Rivier which he conceived or developed while employed by Salk, or during the course of his utilization of any Institute research facilities, and to execute any documents and do all things necessary to assign to The Salk Institute all rights, title, and interest in any such invention conceived or developed while he was employed by The Salk Institute, or during the course of utilization of any Salk Institute research facilities, and to assist The Salk Institute in securing patent protection for such

1    inventions.  Dr. Rivier was employed by The Salk Institute at all relevant times alleged in this

2    complaint.

3         **71.**    The Salk Institute is informed and believes, and therefore alleges, that Defendants

4    all had actual knowledge of The Salk Institute's contract rights.

5         **72.**    The Salk Institute is informed and believes, and therefore alleges, that the Ferring

6    entities and Mr. Paulsen conspired with one another to intentionally cause Dr. Rivier to commit a

7    breach or disruption of The Salk Institute's contract rights.

8         **73.**    As detailed more fully above, Dr. Rivier committed a breach or disruption of

9    contract by failing to disclose his inventions alleged herein to Salk,  and by further failing to

10   assign his rights to the '730 and '798 Patents to The Salk Institute.

11        **74.**    The conduct of the Defendants, including Ferring and  Mr. Paulsen, is a proximate

12   cause of damages and harm to The Salk Institute in an amount to be proven at trial.

13        **75.**    The Salk Institute is informed and believes, and therefore alleges, that the purpose

14   of the conduct of Defendants was to cause Dr. Rivier to breach his contract with The Salk

15   Institute, to wrongfully obtain assignment of Dr. Rivier's rights to the '730 and '798 Patents.

16   Thus, the conduct of Defendants was willful, wanton, malicious, fraudulent and/or oppressive,

17   and justifies an award of exemplary or punitive damages.

18              **COUNT THREE – AGAINST ALL DEFENDANTS**

19              **(Intentional Interference with Economic Advantage)**

20        **76.**    The Salk Institutes incorporates by reference the allegations set forth in paragraphs

21   1 through 75 of this Complaint as though set forth in full in Count Three.

22        **77.**    The Salk Institute and Dr. Rivier were in an economic relationship that would have

23   resulted in a future economic benefit to The Salk Institute.

24        **78.**    Defendants knew of the relationship between The Salk Institute and Dr. Rivier.

25        **79.**    The Salk Institute is informed and believes, and therefore alleges, that Defendants

26   conspired with one another to intentionally interfere with The Salk Institute's prospective

27   economic relationship with Dr. Rivier.

28

80. As detailed more fully above, on information and belief, Defendants interfered with those prospective economic relations by causing Dr. Rivier to fail to disclose and assign his rights to the '730 and '798 Patents to The Salk Institute.

81. As detailed more fully above, The Salk Institute is informed and believes, and therefore alleges, that the conduct of Ferring and Mr. Paulsen was independently wrongful because it resulted in Ferring misappropriating Salk's rights to the '730 and '798 Patents. The Salk Institute made a substantial investment of time, effort and money to support Dr. Rivier's research in the GnRH antagonist field. Ferring, however, was able to appropriate Dr. Rivier's decades of know-how in the GnRH antagonist field at little cost. The Salk Institute is further informed and believes, and therefore further alleges, that the conduct of Ferring and Mr. Paulsen was also independently wrongful because through the unauthorized manufacture, use, sale, and offering for sale of degarelix (trade name: FIRMAGON) Ferring has been and still is directly infringing, contributorily infringing and/or inducing others to infringe the '207 Patent under 35 U.S.C. § 271 by practicing one or more of the claims of the '207 Patent.

82. The conduct of Defendants is a proximate cause of damages and harm to The Salk Institute in an amount to be proven at trial.

83. The Salk Institute is informed and believes, and therefore alleges, that the purpose of the conduct of Defendants was to cause Dr. Rivier to breach his obligations to The Salk Institute, to wrongfully obtain assignment of Dr. Rivier's rights to the '730 and '798 Patents. Thus, the conduct of Defendants was willful, wanton, malicious, fraudulent and/or oppressive, and justifies an award of exemplary or punitive damages.

## COUNT FOUR– AGAINST FERRING

### (Unjust Enrichment)

84. The Salk Institutes incorporates by reference the allegations set forth in paragraphs 1 through 83 of this Complaint as though set forth in full in Count Four.

85. The Salk Institute is informed and believes, and therefore alleges, that by virtue of Dr. Rivier's work for Ferring in the GnRH antagonist field and assignment to Ferring of his

interest in the '730 and '798 Patents, Ferring has obtained exclusive rights to patents to which it does not hold exclusive rights.

86.     The benefits to Ferring of the assignment of Dr. Rivier's rights to the '730 and '798 Patents has been and continues to allow Ferring to be unjustly enriched at the expense of The Salk Institute has supported decades of work by Dr. Rivier in the GnRH antagonist field.

87.     The conduct of Ferring is a proximate cause of damages and harm to The Salk Institute in an amount to be proven at trial.

## COUNT FIVE – AGAINST ALL DEFENDANTS

### (Unfair Competition – Cal. Bus. & Prof. § 17200)

88.     The Salk Institutes incorporates by reference the allegations set forth in paragraphs 1 through 87 of this Complaint as though set forth in full in Count Five.

89.     Ferring's and Mr. Paulsen's acts and practices described above are likely to mislead prospective purchasers of FIRMAGON that Ferring is the sole owner of the rights to degarelix.  These acts and practices are also unfair and prejudicial to the rights and interests of The Salk Institute.

90.     As a direct and proximate result of Ferring's and Mr. Paulsen's unlawful, unfair and fraudulent business practices, The Salk Institute is entitled to an injunction enjoining Ferring's unfair practices, restitution for any pecuniary benefits or revenues Ferring receives from the sale of FIRMAGON that are attributable to Dr. Rivier's contribution to the '730 Patent.

## COUNT SIX – AGAINST FERRING

### (Patent Infringement)

91.     The Salk Institutes incorporates by reference the allegations set forth in paragraphs 1 through 90 of this Complaint as though set forth in full in Count Six.

92.     On April 9, 1996, the USPTO duly and legally issued the '207 Patent entitled "GnRH Antagonists XIII."  The '207 Patent is assigned to The Salk Institute and lists as inventors Jean E.F. Rivier, John S. Porter, Carl A. Hoeger, Guangcheng Jiang, and Catherine L. Rivier.  A copy of the '207 Patent is attached to this Complaint as Exhibit A.

**93.**    The Salk Institute is informed and believes, and therefore alleges, that Ferring has been and still is directly infringing, contributorily infringing and/or inducing others to infringe the '207 Patent under 35 U.S.C. § 271 by practicing one or more of the claims of the '207 Patent through the unauthorized manufacture, use, sale, and offering for sale of degarelix (trade name: FIRMAGON), and will continue to do so, unless and until enjoined by this Court.

**94.**    Ferring's infringement of the '207 Patent has injured The Salk Institute in its business and property rights.  The Salk Institute is entitled to recover monetary damages for such injuries pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

**95.**    Ferring's infringement of the '207 Patent has caused irreparable damage to The Salk Institute, and will continue to cause irreparable damage to The Salk Institute unless and until Ferring's infringing activities are enjoined by this Court.

**96.**    The Salk Institute is informed and believes, and therefore alleges, that Ferring's acts of infringement of the '207 Patent have been and are deliberate and willful, warranting increased damages and attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

**PRAYER FOR RELIEF**

**Wherefore,** The Salk Institute prays that this Court enter judgment as follows:

**1.**    A declaration adjudging that Ferring holds Dr. Rivier's interest in the '730 and '798 Patents in trust for The Salk Institute and must assign Dr. Rivier's rights to the '730 and '798 Patents to The Salk Institute;

**2.**    A declaration that Mr. Jiang and Dr. Semple were incorrectly named as inventors of the '730 and '798 Patents;

**3.**    A declaration adjudging that Ferring has each infringed one or more claims of the '207 Patent;

**4.**    Issuing injunctive relief as the court deems appropriate and in the public interest enjoining each of Ferring, its officers, agents, servants, employees, and attorneys, and all persons acting in concert or participation with any defendant, that enjoins them from further infringing the '207 Patent, in accordance with 35 U.S.C. § 283;

**5.** Defendants be ordered to pay compensatory damages to The Salk Institute for the damage they caused, including an order mandating Ferring pay damages pursuant to 35 U.S.C. § 284 for infringement of the '207 Patent and not less that one half of the revenues received by Ferring related to the sale, transfer, exploitation or license of degarelix (FIRMAGON) ;

**6.** Ferring be ordered to pay restitution damages for the harm it has caused;

**7.** The Salk Institute recover punitive damages against Defendants, including increased enhanced damages by Ferring in light of its deliberate and willful infringement of the '207 Patent;

**8.** Awarding The Salk Institute its interest, costs, and attorneys' fees incurred in bringing and prosecuting this action pursuant to 35 U.S.C. § 285 , and other applicable law; and

**9.** For such other and further relief as this Court deems just and proper.

Dated: December 22, 2010                    COOLEY LLP


                                            /s/ Anthony M. Stiegler
                                            _____
                                            Attorneys for PLAINTIFF
                                            THE SALK INSTITUTE FOR BIOLOGICAL
                                            STUDIES

                                            Email: tstiegler@cooley.com


                                      * * * *

**JURY DEMAND**

Plaintiff The Salk Institute for Biological Studies hereby demands trial to a jury on all issues so triable.

Dated: December 22, 2010                    COOLEY LLP


                                            /s/ Anthony M. Stiegler
                                            _____
                                            Attorneys for PLAINTIFF
                                            THE SALK INSTITUTE FOR BIOLOGICAL
                                            STUDIES

                                            Email: tstiegler@cooley.com

693116/SD

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
The Salk Institute For Biological Studies

**DEFENDANTS**
Ferring Pharmaceuticals, Inc.; et al.,

(b) County of Residence of First Listed Plaintiff   San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Anthony M. Stiegler, Cooley LLP, 4401 Eastgate Mall, San Diego, CA 92121 (858) 550-6000

Attorneys (If Known)      **'10 CV 2649 DMS CAB**
Gary N. Frischling, Irell & Manella LLP, 1800 Avenue of the Stars, Los Angeles CA 90067  (310) 277-1010

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 271
Brief description of cause:
Patent infringement, declaratory relief, and other state law causes of action

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE                    DOCKET NUMBER

DATE                    SIGNATURE OF ATTORNEY OF RECORD
12/22/2010              s/ Anthony M. Stiegler (Email: tstiegler@cooley.com)

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE